UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| WILLIAM TIDMARSH,<br><br>  Plaintiff,<br><br>v.<br><br>NYE COUNTY SHERIFF'S DEPARTMENT, *et al.*,<br><br>  Defendants. | Case No. 2:15-cv-01970-APG-NJK<br><br>**ORDER GRANTING THE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>(ECF Nos. 43, 54, 55) |

This civil rights case arises out of the criminal prosecution of plaintiff William Tidmarsh, a former Nye County patrol officer, for allegedly sexually assaulting a female citizen whom he gave a ride to while he was on duty. Tidmarsh sued Nye County, former Nye County Sheriff Anthony Demeo, former Nye County Assistant Sheriff Rick Marshall, investigator David Boruchowitz, internal affairs investigator Mark Medina, and deputy Brian Jonas for their alleged roles in the criminal and internal affairs investigations and criminal prosecution.[1] The defendants move for summary judgment on each of Tidmarsh's claims on various grounds. Tidmarsh opposes and moves for summary judgment. I grant the defendants' motions and deny Tidmarsh's motion.

**I. BACKGROUND**

In the early morning of February 8, 2009, Tidmarsh was on duty when he gave a private citizen, non-party Sarah Rollins, a ride home because she was drunk. ECF No. 44 at 10. Rollins subsequently accused Tidmarsh of touching her inappropriately during the drive to her house. *Id.*

---

[1] Tidmarsh also sued the Nye County Sheriff's Department but that defendant was dismissed because it is not a legal entity capable of being sued in its own name. ECF Nos. 9, 19, 20.

On February 12, defendant Medina was assigned to conduct an investigation into the allegations. *Id.* at 4, 9. Medina learned that defendant Jonas had reported to the Sheriff's Office that he received information from a citizen regarding a possible sexual assault by an on-duty deputy. *Id.*

That same day, Medina interviewed Jonas. *Id.* Jonas stated that a person named Regina Webster, a bartender at the Kingdom Gentleman's Nightclub, told him that she had disabled Rollins' car to prevent her from driving while intoxicated, and Rollins went to Indulj Nightclub with some friends. *Id.* Webster told Jonas that Tidmarsh gave Rollins a ride home in his patrol car and the next day, Webster received a text message from Rollins that stated Tidmarsh had violated her during the ride home. *Id.* Medina told Jonas to contact Webster to obtain the text message. *Id.* Jonas did so but reported that Webster said she had deleted the text message and that she would not cooperate with the investigation. *Id.*

Medina then interviewed Webster. *Id.* She was uncooperative at first but (after some threats to revoke her work card and arrest her for obstruction) she gave a story similar to the one Jonas had relayed. *Id.* at 4-5; ECF No. 59. Webster described the text message in further detail, stating that Rollins had texted her: "I got a ride home from the popo. See what happens? He took advantage of me. What do I do?" ECF No. 44 at 5. Webster could not retrieve the text message but she turned over her phone for further investigation. *Id.*

Medina and another detective, Alexandra MacNeil, then interviewed Rollins and her father, Michael. *Id.* Rollins stated she was drunk on the night in question and needed a ride home when Tidmarsh appeared and agreed to give her a ride. *Id.* at 5-6. She rode in the patrol car's back seat from Indulj to Kingdom where her car was parked. *Id.* She got her purse from her car and then got back into the patrol car's back seat. *Id.* She stated that on the way to her house, Tidmarsh pulled to the side of the road, moved some things out of the front passenger seat, and told her to get into the front seat, which she did. *Id.* According to Rollins, Tidmarsh placed his right hand on her upper, inner thigh and that Tidmarsh got "more gropey" from there. *Id.*

They arrived at the driveway to her home and Tidmarsh turned the headlights off and stopped. *Id.* According to Rollins, Tidmarsh asked if anyone was home or awake. *Id.* Tidmarsh then backed out of the driveway with Rollins still in the car. *Id.* He drove on the street directly behind and parallel to the street she lived on. *Id.* at 7. According to Rollins, it was during this part of the drive that Tidmarsh placed his right hand inside her shirt and bra and fondled her right breast. *Id.*

Tidmarsh drove her back to her house and stopped in the street near the entrance to the driveway, where Rollins' father approached them. *Id.* Tidmarsh explained to Rollins' father that he had driven Rollins home because she was drunk. *Id.* At the end of the conversation, Tidmarsh gave Rollins his business card. *Id.* at 8.

Rollins did not tell her father what happened but she did tell her sister. *Id.* Rollins also sent a text to Webster stating she had been assaulted by a police officer and did not know what to do. *Id.* Rollins was not able to retrieve the text from her phone, but she turned the phone over to Medina. *Id.*

Michael Rollins stated that he was in his garage on the night of the incident when a patrol car stopped at the driveway entrance, turned off the headlights, and then backed out of the driveway. *Id.* at 9. Michael saw a vehicle drive on the street behind his house and he believed it to be a patrol car. *Id.* He stated the patrol car returned and parked in front of his house approximately five minutes later, and his daughter got out of the car, although he could not remember whether she got out of the front or back seat. *Id.*

Medina interviewed Sheriff's Office dispatcher Lori Harvey, who was the dispatcher on the night of the incident. *Id.* Harvey stated that Tidmarsh had called her on the phone to advise he was giving Rollins a ride home. *Id.* Harvey stated that after approximately twenty to thirty minutes, she realized she had not heard from Tidmarsh so she called him on the radio. *Id.* He answered to inform he had arrived at Rollins' home and he gave his ending mileage. *Id.* Harvey stated that Tidmarsh came on the radio approximately ten minutes later and cleared the same call for a second time. *Id.* At this point in the investigation, Medina "assumed the singular role of

administrative internal affairs investigator," and he turned the criminal investigation over to MacNeil and another detective with the Sheriff's Office, defendant Boruchowitz. *Id.* at 10, 14.

After Rollins was done speaking with Medina on February 12, she spoke to Boruchowitz and told him that she had not told Medina everything that happened. *Id.* at 14-15. Rollins stated that when she approached Tidmarsh to retrieve his business card, he grabbed her by the belt to pull her close, put his fingers down the front of her pants, and asked if he could come back to her house later that morning. *Id.* at 11, 14-15. During her interview, Rollins agreed to take a CVSA (voice stress) exam that, according to the officer who administered it, registered no deception by Rollins. *Id.* at 15; ECF No. 61.

That same day, Boruchowitz interviewed Rollins' sister Kathleen. ECF No. 44 at 15. Kathleen reported that Sarah came home and was crying on the night in question. *Id.* According to Kathleen, Sarah told her that a cop had given her a ride home and had touched her inappropriately. *Id.*

Boruchowitz contacted Webster's cell phone service provider to retrieve the text message but learned the company could not restore a deleted message. *Id.* at 13. Boruchowitz sent Rollins and Webster's phones to the Las Vegas Metropolitan Police Department's electronics evidence lab to try to recover the messages. *Id.* at 14. The investigators were not able to retrieve the messages from either phone, although phone records showed Webster received a text message from Rollins at 10:46 a.m. on the morning of February 8, 2016. ECF No. 62.

On February 12, Tidmarsh was placed on administrative leave. ECF No. 45 at 9. Tidmarsh asked what was going on and Boruchowitz stated he would talk with Tidmarsh if he wanted. ECF No. 44 at 15-16. Tidmarsh responded he wanted to talk, and he voluntarily spoke with Boruchowitz. *Id.* at 16. Tidmarsh stated that he gave Rollins a ride home and that Rollins moved to get into the front seat but he told her she had to sit in the back. *Id.* at 16. Rollins told him she needed her keys and that her car was at Kingdom, so they drove over there. *Id.* She retrieved her purse and keys, and Tidmarsh then drove her to her home. *Id.* He stated he pulled into the driveway but Rollins told him not to drop her off in front of her father, so he pulled out of

the driveway. *Id.* Tidmarsh initially stated he backed up and pulled back into the driveway. ECF No. 57 at 9-10. Later in the interview, he stated that he turned around and went back to park on the street in front of the house. *Id.* at 30. He did not mention in this initial interview that he drove on the street behind the Rollins home.

Tidmarsh stated that he spoke to Rollins' father and explained that Rollins was not in trouble. ECF No. 44 at 16. According to Tidmarsh, as he was getting a business card to give to Rollins' father, Rollins asked Tidmarsh if he could come back tomorrow. *Id.* Tidmarsh denied that Rollins was ever in the front seat of the patrol car. *Id.* at 17. Tidmarsh also stated he was talking on the phone to another deputy, Danneker, for "quite a bit" while transporting Rollins. ECF No. 57 at 21. Phone records showed that Tidmarsh spoke to Danneker once during the critical time period after Rollins retrieved her purse at Kingdom and Tidmarsh was driving her home. *Compare* ECF No. 44 at 23 (Danneker's phone shows calls with Tidmarsh at 2:38, 3:10, 3:28, and 3:46) *with* ECF No. 60 at 9-10 (dispatch records showing Tidmarsh called in that he was doing a "bar check" at Indulj at 2:33, that he was doing a courtesy transport at 2:37, called in his starting mileage at 2:52, that he was clear at 3:14, and that he was clear for a second time at 3:22).

After the interview, Boruchowitz processed Tidmarsh's patrol vehicle and then arrested him. ECF Nos. 47 at 26; 60 at 9. Tidmarsh bailed out within an hour of being taken to jail. ECF No. 66-2 at 14.

A few days later, Tidmarsh went to a market along the route he drove on the night of the incident. ECF No. 44 at 29. Tidmarsh identified himself as a deputy sheriff and asked to see video surveillance that might show his patrol car passing the market and show whether Rollins was in the front or back seat of the patrol car. *Id.* When Boruchowitz went to the same market the next day to obtain any video that might assist in the investigation, the employees told him that Tidmarsh had been there the day before requesting to see the same thing. *Id.*

Boruchowitz told Medina that Tidmarsh had visited the market. ECF No. 45 at 13. As a result, Medina and defendant assistant sheriff Rick Marshall met with Tidmarsh to discuss

Tidmarsh's visit to the store. *Id.* Marshall told Tidmarsh that they had information that Tidmarsh went to a store to attempt to obtain videotape in connection with the investigations. *Id.* Tidmarsh responded that he did not attempt to obtain a videotape. *Id.* Marshall told Tidmarsh they had information that Tidmarsh had identified himself as a peace officer while at the store. *Id.* Tidmarsh responded that he did not do that. *Id.* Medina then advised Tidmarsh that additional internal affairs charges were being lodged against him for insubordination for violating the terms of his administrative leave (which directed that he not engage in any law enforcement activity while on leave) and for obstructing. *Id.* Based on written statements from the store employees that Tidmarsh had identified himself as a peace officer and had requested the video, Medina charged him with an additional count of insubordination and dishonesty in the performance of duties. *Id.*

On March 26, DNA testing of Rollins' clothing from the night in question came back positive for male DNA on her bra, belt buckle, and interior of her pants but the DNA was not Tidmarsh's. *Id.* at 28. Medina thus re-interviewed Rollins on April 9, at which time she indicated it was possible she was too drunk to remember the details of what happened on the night of the incident. *Id.* at 30. Medina asked her to describe what else was in the front seat of the patrol car, but she recalled only that Tidmarsh moved something out of the way for her to sit down. *Id.* When Medina informed Rollins of the negative DNA test results, she stated she had washed her clothing before those items were seized as evidence. *Id.* Rollins then backtracked and stated the clothes had been retrieved from her dirty clothes hamper and had not been washed. *Id.*

Medina's April 16, 2009 internal affairs report concluded that there was no compelling evidence to support administrative charges against Tidmarsh related to oppression, lewdness, or battery because although Rollins strongly asserted wrongdoing, Tidmarsh was equally adamant that nothing had happened and Rollins' statements had some inconsistencies. *Id.* at 34. For example, Rollins did not recall a large computer and computer stand in the patrol car's front seat area. *Id.* Medina also noted that Tidmarsh maintained his innocence even when Medina falsely told him that there had been a positive DNA match and that Rollins' father saw Rollins emerge

from the front seat. *Id.* Medina also noted that Rollins left out the allegation that Tidmarsh put his fingers down her pants in the first interview with her and she changed her story about whether the bra had been washed when confronted with the negative DNA results. *Id.*

However, Medina found several administrative charges against Tidmarsh were sustained, including willful misconduct and violating the code of professional conduct based on procedural irregularities associated with his driving Rollins home that night. *Id.* at 36. Medina also found that administrative charges related to Tidmarsh's actions surrounding his visit to the market and his later denials were sustained. *Id.* at 36-39. Following a pre-termination hearing in July 2009, Tidmarsh was terminated on September 11, 2009. ECF Nos. 54-1 at 25; 54-7.

Meanwhile, the preliminary hearing on the criminal charges was held on August 20, 2009. ECF No. 48. Several witnesses testified at the hearing, including Rollins. *Id.* The judge ruled that probable cause had been established for the three charges that were then-pending (open and gross lewdness, oppression under color of law, and false imprisonment) and bound Tidmarsh over for trial. *Id.* at 310-13. The criminal case against Tidmarsh was dismissed on October 15, 2013. ECF No. 54-1 at 32.

Tidmarsh filed suit in this court on October 13, 2015. He asserts in count one a claim under 42 U.S.C. § 1983 for due process violations based on the defendants (1) withholding from the defense prior to the preliminary hearing Medina's internal affairs report and exculpatory DNA evidence, (2) providing false testimony against him (based on Boruchowitz allegedly fabricating that Rollins passed the voice stress test), (3) pressuring the district attorney to prosecute Tidmarsh in the absence of probable cause, and (4) failing to conduct an adequate investigation. The amended complaint alleges these actions led to his wrongful conviction (even though the charges were dismissed), wrongful discharge, and malicious prosecution. Tidmarsh contends these due process violations were the result of Nye County policies and practices, including a policy of allowing officers to not obtain exculpatory evidence, allowing officers to not disclose exculpatory evidence, failing to use generally accepted law enforcement procedures concerning probable

cause, allowing officers to coach witnesses and withhold or conceal information, and failing to discipline poorly performing officers.

In count two, Tidmarsh asserts a § 1983 claim based on an alleged denial of equal protection under the Fourteenth Amendment, claiming the defendants treated him differently than other similarly situated sexual assault suspects. In count three, Tidmarsh alleges the defendants conspired to violate his civil rights, maliciously prosecute him, falsely arrest and imprison him, and intentionally inflict emotional distress. Finally, in count four, Tidmarsh asserts an intentional infliction of emotional distress claim.

## II. ANALYSIS

Summary judgment is appropriate if the pleadings, discovery responses, and affidavits demonstrate "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000). I view the evidence and reasonable inferences in the light most favorable to the non-moving party. *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008).

### A. Statute of Limitations

The defendants argue that all of Tidmarsh's claims except his malicious prosecution claim are time-barred. Tirdmarsh responds that all of his claims are timely because the charges against him were dismissed on October 15, 2013 and he filed his complaint within two years of that date.

/ / / /

*1. Section 1983 Claims*

Tidmarsh's malicious prosecution claim is timely because it did not accrue until the charges were dismissed on October 15, 2013. *Heck v. Humphrey*, 512 U.S. 477, 489 (1994); *Cabrera v. City of Huntington Park*, 159 F.3d 374, 382 (9th Cir. 1998). Tidmarsh brought this lawsuit less than two years later. He therefore sued within the applicable two-year limitation period. *See Rosales-Martinez v. Palmer*, 753 F.3d 890, 895 (9th Cir. 2014) (explaining that Nevada's two-year limitation period for personal injury claims applies to federal claims under § 1983).

However, Tidmarsh's other § 1983 claims are untimely. Tidmarsh contends the defendants violated *Brady v. Maryland* by failing to turn over the internal affairs report (which contained exculpatory information about Rollins changing her story about her clothes being washed and being unable to describe the contents of the patrol car's front seat area) prior to the preliminary hearing. Tidmarsh contends that by failing to turn over that report, the defendants were able to present materially false testimony at the preliminary hearing, including Rollins claiming she washed her clothes and Boruchowitz claiming that MacNeil told him the clothes had been washed prior to being seized. However, Tidmarsh was aware in July 2009 both that Medina's report existed and had not been turned over prior to the preliminary hearing and that there was some dispute about the reliability of Rollins' CVSA test results. *See* ECF No. 54-7 at 4 (discussion about CVSA being "compromised"); ECF No. 70-1 at 2 (discussion at the July 2009 pre-termination hearing about Medina's findings in Tidmarsh's favor). Thus, this claim is untimely because it was not filed within two years of when he knew or had to reason to know of the injury forming the basis of this claim. *See Rosales-Martinez*, 753 F.3d at, 895.[2]

---

[2] Even if timely, the claim has multiple defects. First, this could be considered a *Brady*-type claim under *Tatum v. Moody* for pre-trial detentions "of (1) unusual length, (2) caused by the investigating officers' failure to disclose highly significant exculpatory evidence to prosecutors, and (3) due to conduct that is culpable in that the officers understood the risks to the plaintiff's rights from withholding the information or were completely indifferent to those risks." 768 F.3d 806, 819-20 (9th Cir. 2014). However, Tidmarsh was not held in lengthy pre-trial detention. Rather, he bailed out within an hour. Additionally, the exculpatory evidence he complains about was not uncovered by the time of his arrest. And he has not shown the officers understood or

As to the equal protection claim, Tidmarsh knew of the injuries forming the basis of this claim no later than 2009 when the investigation was completed and the charges submitted to the district attorney's office. Tidmarsh does not identify anything that was done after that point by these defendants in terms of treating him differently than similarly situated individuals accused of crimes.[3] This claim is therefore time-barred.

Tidmarsh cites no authority for his position that because his malicious prosecution claim is timely, all of his claims are timely. The law is to the contrary. The limitation period under § 1983 begins to run "when the plaintiff has a complete and present cause of action," meaning "the plaintiff can file suit and obtain relief." *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (quotations omitted). Tidmarsh had a complete cause of action for alleged *Brady* and equal protection violations based on acts or omissions that occurred in 2009 once he learned about those acts or omissions. The fact that consequences of those actions continued until the charges against

---

were completely indifferent to the risk that failure to disclose the information might pose. The exculpatory evidence undermined Rollins' credibility but it did not establish Tidmarsh's innocence.

Alternatively, Tidmarsh could be pursuing a substantive due process claim under *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) (en banc). *Devereaux* recognized a "constitutional due process right not to be subject to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Id.* at 1074-75. To state a *Devereaux* claim, Tidmarsh must present evidence showing either: "(1) Defendants continued their investigation of [Tidmarsh] despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." *Id.* at 1076. Although Tidmarsh alleges that the DNA results were withheld, the parties discussed the DNA results at the preliminary hearing. ECF No. 63 at 117-19. Viewing the evidence in the light most favorable to Tidmarsh, he has shown only that Medina discovered evidence that undermined Rollins' credibility and did not turn that information over to prosecutors or the defense prior to the preliminary hearing. The fact that the complaining witness had credibility issues does not mean the defendants knew or should have known Tidmarsh was innocent. Aspects of Rollins story were corroborated by other witnesses and Tidmarsh had his own credibility problems, including his initial failure to recount that he drove behind the Rollins home (where the alleged fondling occurred) and his denials that he identified himself as a peace officer and sought to obtain video surveillance from the market.

[3] Even if this claim were somehow timely, Tidmarsh presents no evidence that he was treated differently than other suspects. Indeed, he presents no evidence of how others accused of crimes were treated, much less how that differs from how he was treated.

Tidmarsh were dropped in 2013 does not extend the limitation period. *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1058 (9th Cir. 2002) (The defendant's "decision to institute formal abatement hearings . . . was the 'operative decision' for the purposes of triggering the § 1983 statute of limitations. The actual beginning of the abatement hearing on November 14 was simply the effect of that decision and was not a separately unconstitutional act."). Thus, the defendants are entitled to summary judgment on Taylor's *Brady* and equal protection claims as time-barred.

### 2. State Law Claims

Tidmarsh asserts state law claims for conspiracy and intentional infliction of emotional distress.[4] The limitation period for intentional infliction of emotional distress is two years. Nev. Rev. Stat. § 11.190(4)(e). The underlying alleged misconduct occurred in 2009, so this claim is time-barred. Tidmarsh does not present evidence that these defendants did anything after 2009 that would support an intentional infliction of emotional distress claim.

Finally, the limitation period for Taylor's civil conspiracy claim is four years. *Siragusa v. Brown*, 971 P.2d 801, 806 (Nev. 1998) ("Civil conspiracy is governed by the catch-all provision of NRS 11.220, which provides that an action 'must be commenced within 4 years after the cause of action shall have accrued.'"). This limitation period "runs from the date of the injury rather than the date the conspiracy is discovered." *Id.* Consequently, this claim is time-barred because it is based on the defendants' conduct in 2009, except for that portion of the claim which alleges the defendants conspired to maliciously prosecute him.

### B. Malicious Prosecution

Tidmarsh's only timely claims are for malicious prosecution and related municipal liability and conspiracy claims. To "prevail on a § 1983 claim of malicious prosecution, a

---

[4] Although the amended complaint does not specifically assert a state law false arrest claim, any such claim would be time-barred. The limitation period for a false arrest claim is two years. Nev. Rev. Stat. § 11.190(4)(c). Tidmarsh was arrested, bailed out of jail, and had his preliminary hearing in 2009. Therefore, this claim is time-barred. To the extent Tidmarsh is asserting wrongful termination, that is also time-barred because he was fired in 2009. *See id.* § 11.190(4)(e) (two year limitation period for personal injuries due to a wrongful act).

plaintiff 'must show that the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying [him] equal protection or another specific constitutional right.'" *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) (quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995)). A plaintiff may bring a malicious prosecution claim against prosecutors and "other persons who have wrongfully caused the charges to be filed." *Id.* A judge's decision "to hold a defendant to answer after a preliminary hearing constitutes *prima facie*—but not conclusive—evidence of probable cause." *Id.* at 1067 (emphasis omitted). A plaintiff can rebut that *prima facie* evidence "by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith." *Id.*

Similarly, "the decision to file a criminal complaint is presumed to result from an independent determination on the part of the prosecutor, and thus, precludes liability for those who participated in the investigation or filed a report that resulted in the initiation of proceedings." *Id.* But the plaintiff can assert a claim against an official "who improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." *Id.*

Tidmarsh's malicious prosecution claim fails on numerous grounds. First, Tidmarsh has made no argument and presented no evidence raising an issue of fact that any of the defendants urged he be prosecuted for the purpose of denying him equal protection or some other specific constitutional right.

Second, probable cause existed. "Probable cause exists when the facts and circumstances within the officer's knowledge are sufficient to cause a reasonably prudent person to believe that a crime has been committed." *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1053 (9th Cir. 2009). The "relevant inquiry is what the agents knew, collectively, at the time they arrested" the plaintiff. *United States v. Collins*, 427 F.3d 688, 691 (9th Cir. 2005). To establish probable cause, an officer "may not solely rely on the claim of a citizen witness that he was a victim of a crime,

1 but must independently investigate the basis of the witness' knowledge or interview other witnesses." *Peng v. Mei Chin Penghu*, 335 F.3d 970, 978 (9th Cir. 2003) (quotation omitted). "A sufficient basis of knowledge is established if the victim provides facts sufficiently detailed to cause a reasonable person to believe a crime had been committed and the named suspect was the perpetrator." *Id.* (quotation omitted).

Here, Boruchowitz did not rely solely on Rollins' account before making the decision to arrest. He independently investigated the incident by interviewing Rollins, her sister, and Tidmarsh. MacNeil interviewed Rollins, her father, her sister, and Danneker. Rollins' father corroborated an important aspect of Rollins' story that the patrol car entered the driveway but then backed out and went down the street behind the Rollins' property. Tidmarsh, meanwhile, initially stated that he went down Rollins' street and either backed up and turned around. He thus did not reveal that he had driven on the street behind the Rollins' house, which is where the alleged fondling took place.

Rollins' sister corroborated Rollins' account because Rollins immediately reported the incident to her. Webster also corroborated Rollins' story that she sent Webster a text message about Tidmarsh inappropriately touching her that same day. Additionally, Rollins passed a voice stress analysis test showing no deception on her part. Although this test result was later called into question, probable cause is determined at the time of arrest.

Rollins had credibility issues, including the fact that she was drunk on the night in question. But Tidmarsh's dispute about who Boruchowitz should have believed and how he interpreted the evidence does not raise an issue of fact that Boruchowitz lacked probable cause to arrest Tidmarsh for various crimes. *See, e.g.*, Nev. Rev. Stat. §§ 197.200 (oppression under color of office); 201.210 (open/gross lewdness), 200.460 (false imprisonment). Boruchowitz was at worst reasonably mistaken about whether probable cause supported the arrest, and thus would be entitled to qualified immunity. *See Rodis v. City, Cty. of San Francisco*, 558 F.3d 964, 971 (9th Cir. 2009).

Finally, there is no evidence that the decision to prosecute was anything but an independent decision of the prosecutor. *See* ECF No. 95-3 at 19-20 (district attorney Brian Kunzi stating whether a case gets charged or proceeds to trial was solely in his discretion and members of the sheriff's office would not be involved in that decision-making process). Although Tidmarsh alleged in his amended complaint that the defendants pressured the prosecutor to continue to pursue the charges, he presents no evidence of that. Nor does he present any evidence that if the prosecutors had seen Medina's internal affairs findings, they would have decided not to pursue the charges.

Accordingly, I grant the defendants' motion for summary judgment on Tidmarsh's malicious prosecution claim. Because Tidmarsh does not have a viable § 1983 claim, I also grant the defendants' summary judgment motion on his claim against Nye County under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). *See Yousefian v. City of Glendale*, 779 F.3d 1010, 1016 (9th Cir. 2015) (stating "municipalities cannot be held liable when the individual police officer has inflicted no constitutional injury"). Finally, for the same reasons, I grant the defendants' motion for summary judgment on Tidmarsh's claim that the defendants conspired to maliciously prosecute him.[5]

### III. CONCLUSION

IT IS THEREFORE ORDERED that plaintiff William Tidmarsh's motion for summary judgment **(ECF No. 43) is DENIED**.

IT IS FURTHER ORDERED that defendants Nye County, Anthony Demeo, Rick Marshall, Mark Medina, and Brian Jonas's motion for summary judgment **(ECF No. 54) and** defendant David Boruchowitz's joinder thereto **(ECF No. 55) are GRANTED**.

/ / / /

/ / / /

/ / / /

---

[5] Further, Tidmarsh presents no evidence the defendants agreed to maliciously prosecute him.

IT IS FURTHER ORDERED that the clerk of court shall enter judgment in favor of the defendants and against the plaintiff.

DATED this 20th day of June, 2017.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE